IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Criminal Action No. 00-cr-00439-6

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WALLACE RAYMOND CROOKS,

    Defendant.

---

**OPINION AND ORDER DENYING MOTION TO REDUCE SENTENCE**

---

**THIS MATTER** comes before the Court pursuant to Mr. Crooks' Motion to Reduce Sentence **(# 1988)**, the Government's response **(# 1993)**, and Mr. Crooks' reply **(# 1994)**. Also pending is Mr. Crooks' Motion to Expedite **(# 1997)**, which the Court now denies as moot.

## FACTS

Mr. Crooks, along with more than a dozen co-defendants, was indicted in 2000 and charged with participating in a conspiracy to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(A).

The charge against Mr. Crooks proceeded to a bench trial in 2002. On April 8, 2002, Judge Daniel B. Sparr found Mr. Crooks guilty on the charge against him. In announcing his verdict, Judge Sparr found that beginning in January 1999 and continuing through May 1999, Mr. Crooks, along with numerous co-defendants, was involved in "an organization formed and operated for the sole purpose of distributing crack cocaine, principally in the areas of Pueblo and Colorado Springs, Colorado. Judge Sparr specifically found that:

1

> As far as the quantities involved in this case, the Court finds that the government has proven beyond any reasonable doubt that the co-defendant[s] specifically involved with the Defendant, Wallace Raymond Crooks, in the distribution of crack cocaine from the Raintree Apartments during the period from January 1999 to May of 1999 were involved in the possession with intent to distribute or actual distribution of at least 60 to 75 ounces of crack cocaine.
>
> The Court would also find that based upon the government's proof beyond a reasonable doubt, Defendant Crooks alone specifically was involved with some 20 to 25 ounces. Converting these quantities to grams at 28 grams per ounce, the evidence clearly supports the government's contention that this defendant possessed with intent to distribute and actually distributed far in excess of 50 grams of a mixture and substance containing cocaine base.

On October 10, 2002, Judge Sparr sentenced Mr. Crooks. Based on the 2001 Sentencing Guidelines manual and a determination that the conspiracy as a whole involved between 1,701 and 2,126 grams of a substance containing cocaine base, the court determined that Mr. Crooks' offense level was 38. It calculated his criminal history category of VI, and that the resultant guideline range was 360 months to life imprisonment. Judge Sparr sentenced Mr. Crooks to 360 months of imprisonment. Mr. Crooks appealed both his conviction and his sentence, but the 10th Circuit affirmed Judge Sparr on both matters. *U.S. v. Crooks*, 73 Fed.Appx. 353 (10th Cir. 2003). In late 2004, Mr. Crooks filed a Motion to Vacate under 28 U.S.C. § 2255, which Judge Sparr denied as untimely. The 10th Circuit affirmed the denial of a Certificate of Appealability, effectively affirming the denial of Mr. Crooks' motion. *U.S. v. Crooks*, 143 Fed.Appx. 125 (10th Cir. 2005).

In or about 2008, the United States Sentencing Commission retroactively lowered the sentencing guidelines applicable to offenses involving crack cocaine. Mr. Crooks initially applied *pro se* for relief under 18 U.S.C. § 3582(c), but counsel appointed for Mr. Crooks ultimately concluded that Mr. Crooks was not eligible for a sentence reduction under the

modified guidelines, due to his status as a "Career Offender" under §4B1.1 of the Sentencing Guidelines. Thus, in June 2008, the Court denied Mr. Crooks' request. (In 2014, Mr. Crooks made a second application for relief under Section 3582, resulting from an anticipated second adjustment to the Sentencing Guidelines. He withdrew this application after consulting with counsel and determining that the request was premature.)

Mr. Crooks filed an amended § 2255 motion in 2016, invoking the holdings of *Johnson v. U.S.*, 135 S.Ct. 2551 (2015) and its progeny, contending that the guidelines provisions that designated him as a Career Offender were unconstitutionally vague. This Court denied Mr. Crooks' motion as untimely, and the 10th Circuit affirmed. *U.S. v. Crooks*, 769 Fed.Appx. 569 (10th Cir. 2019).

Finally, on June 14, 2019, Mr. Crooks filed the instant motion pursuant to 18 U.S.C. §3582. In that motion, Mr. Crooks contends that he is entitled to a sentence reduction under one or both of two theories: (i) under the First Step Act of 2018, and (ii) under 18 U.S.C. § 3582(c)(2). Mr. Crooks contends that, in either instance, his new guideline range would warrant a sentence of 221 months or less, and that he has already served in excess of that time. Thus, Mr. Crooks contends that he should be sentenced to time served and immediately released.

## ANALYSIS

**A. Fair Sentencing Act / First Step Act**

In 2010, Congress amended the Controlled Substances Act to remedy a disparity that existed between sentences imposed for the distribution of cocaine in powder form and the distribution of substances containing cocaine base (also known as "crack" cocaine). Distribution of cocaine base had been punished far more harshly than distribution of equivalent quantities of powder cocaine. In the Fair Sentencing Act of 2010, P.L. 111-220, Congress reduced that

disparity by amending 21 U.S.C. § 841(b)(1), the sentencing scheme for controlled substance offenses. As relevant here, that statute provides two tiers of punishment based on the quantity of crack cocaine involved in the offense. The higher tier is found at §841(b)(1)(A) and the lower tier at §841(b)(1)(B). Prior to the Fair Sentencing Act, the higher tier of punishment was triggered if the offense involved 50 grams or more of a substance containing crack cocaine; the Fair Sentencing Act raised that threshold to 280 grams or more of such a substance. The Fair Sentencing Act also modified the thresholds for the lower tier of punishment. That tier now applies if the offense involved between 28 and 279 grams of a substance containing crack; it had previously applied to quantities as small as 5 grams of such a substance. The Fair Sentencing Act was not construed to have retroactive application, and thus, its modification of the statutory sentencing scheme did not grant any relief to defendants like Mr. Crooks, who were convicted prior to the statute's enactment.

In 2018, Congress again reduced the severity of sentencing for certain controlled substances offenses via the First Step Act of 2018, P.L. 115-391. The First Step Act made several additional changes to 21 U.S.C.. § 841(b)(1). As pertinent here, the First Step Act operated to make retroactive the amendments made by the Fair Sentencing Act. In other words, defendants who were already serving a sentence for a controlled substance offense involving crack cocaine as of 2010 could move to have their sentence reduced as if the Fair Sentencing Act had been in effect at the time they were originally sentenced.

1. **Eligibility**

Mr. Crooks contends that the Fair Sentencing Act adjustments to 21 U.S.C. § 841(b)(1), as made retroactive to his case by the operation of the First Step Act, entitle him to both a re-

sentencing and a sentence reduction. This Court begins by considering the hotly-disputed question of whether Mr. Crooks is entitled to resentencing at all.

Section 404(a) of the First Step Act defines the key that unlocks a defendant's ability to request a resentencing: the defendant must have committed a "covered offense" – namely:

> a violation of a Federal criminal statute, the statutory penalties for which were modified by . . . the Fair Sentencing Act of 2010, that was committed before August 3, 2010.

The parties here disagree as to how this statutory language should be parsed. There is no dispute that Mr. Crooks' offense occurred prior to August 2010, and there is no dispute that, in general, the Fair Sentencing Act modified the statutory penalties for controlled substance offenses. The parties' disagreement focuses on the phrase "violation of a [ ] statute, the statutory penalties for which . . . ." The Government believes that the phrase "statutory penalties for which" modifies the noun "violation"; Mr. Crooks believes that phrase modifies "statute."

If Mr. Crooks is correct, some of the penalties in the "statute" he was accused of violating – essentially, 21 U.S.C. § 841(b)(1) – were modified by the Fair Sentencing Act. Mr. Crooks' argument focuses on the crime charged in the <u>indictment</u>, not on the particular conduct applicable to his case. The crime charged in Mr. Crooks' indictment, conspiracy to distribute 50 grams or more of a substance containing crack cocaine, saw its statutory penalties modified by the Fair Sentencing Act because distribution of 50 grams[1] of crack cocaine went from being punished under the high tier of 21 U.S.C. § 841(b)(1)(A) to being punished by the lower tier of 21 U.S.C. §841(b)(1)(B). Thus, Mr. Crooks argues that the <u>statute</u> he was accused of violating had its penalties reduced, entitling him to seek resentencing under the First Step Act.

---

[1] Neither party grapples with the "or more" component of the Indictment.

The Government reads the term "statutory penalties for which" to modify the noun "violation." Thus, the Government contends that the focus should be on whether the <u>conduct the defendant was found to have committed</u> would have been punished less severely had the Fair Sentencing Act been in place at the time. Here, because Judge Sparr found that Mr. Crooks was responsible for distributing at least 567 grams of crack,[2] the Government argues that the Fair Sentencing Act did not change the statutory penalties applicable to Mr. Crooks' particular offense. Rather, because Mr. Crooks' conduct exceed even the new statutory threshold of 280 grams of crack, Mr. Crooks would still have been subject to punishment under the highest tier of penalties found in 21 U.S.C. § 841(b)(1)(A) even if the Fair Sentencing Act had been in place at the time of his conviction. Thus, the Government argues, the statutory penalties applicable to Mr. Crooks' particular violation were <u>not</u> changed by the Fair Sentencing Act, and therefore, the First Step Act does not operate to entitle him to consideration for resentencing.

The first Circuit Court to address the issue has concluded that Mr. Crooks' interpretation of the statute is the correct one. *See U.S. v. Wirsing*, 943 F.3d 175, 185-86 (4th Cir. 2019) ("There is no indication that Congress intended a complicated and eligibility-limiting determination [about actual conduct] at the 'covered offense' stage of the analysis"). And that interpretation is consistent with the conclusions of "the vast majority of courts that have addressed this issue," including the influential decision in *U.S. v. Rose*, 379 F.Supp.3d 223, 228 (S.D.N.Y. 2019) (collecting cases), among others. *See U.S. v. Curry*, 2019 WL 6826528 (W.D. La. Dec. 13, 2019) (slip op.) *and cases cited therein*; *U.S. v. Byrd*, 2019 WL 6493939 (W.D.Tx.

---

[2] As noted above, Judge Sparr found that Mr. Crooks had personally been involved in distributing anywhere from 20 to 75 ounces of crack cocaine. One ounce is 28.35 grams, and thus 20 ounces, the minimum that Mr. Crooks was found to have personally distributed, would amount to some 567 grams of crack cocaine. Judge Sparr also found that Mr. Crooks was jointly responsible for the conspiracy's distribution of roughly 1,700 to 2,100 grams of crack.

Dec. 3, 2019) (slip op.) (same). A smaller number of trial courts have reached the opposite conclusion, finding that the offense conduct, not the indictment, dictates whether a defendant is eligible for resentencing. *See U.S. v. Blocker*, 378 F.Supp.3d 1125, 1129 (N.D. Fl. 2019) ("The indictment controls theory misreads the statute and is demonstrably inconsistent with Congress's intent"); *U.S. v. Willis*, 2019 WL 4849435 (E.D. Pa. Sept. 30, 2019) (slip op.).

    A.  <u>Plain language of Section 404(a)</u>

Although this Court is always reluctant to swim against the tide of authority, it finds the "conduct controls" interpretation of the First Step Act in *Blocker* to be more persuasive than the "indictment controls" interpretation in cases like *Rose* and *Wirsing*. To begin with, this Court rejects the initial premise of *Rose* and other "indictment controls" cases: that standard English grammar presumes that a modifier ("the statutory penalties for which . . .") modifies the closest preceding noun ("statute," rather than "violation"). English language grammar is not nearly so rigid and there are many instances in which an adjectival phrase properly modifies a more remote noun.³ Indeed, one need look no further than the remainder of Section 404(a) itself for such an example. To apply the rule of grammar that *Rose* relies upon, the adjectival phrase "that

---

³    *Lopez v. Gonzalez*, 549 U.S. 47, 56 (2006), cited by *Wirsing*, is not to the contrary. There, the Supreme Court considered whether a "drug trafficking crime," which was defined as "any felony punishable under the Controlled Substances Act," would include a state-level felony conviction that, had it been prosecuted federally under the Controlled Substances Act, would only have been classified as a misdemeanor. The Government argued that the statute "requires only that the offense be punishable, not that it be punishable as a federal felony," thus suggesting that the phrase "punishable under. . ." should not be read to modify "felony," and rather, should stand alone. Rejecting that argument, the Court explained that "we do not use a phrase like 'felony punishable under the CSA' when we mean to signal or allow a break between the noun 'felony' and the contiguous modifier 'punishable' . . . The last thing this approach would do is divorce a noun from the modifier next to it without some extraordinary reason." *Id.* at 54, 56. But *Lopez* involved a phrase in which the modifier ("punishable . . .") followed the noun ("felony") without any interruption. Here, the modifier ("the statutory penalties") is set off from both nouns "violation" and "statute" by a comma, establishing precisely the sort of "signal or [ ] break" that the Court found missing in *Lopez*.

7

was committed before August 3, 2010" would be presumed to modify its closest neighbor, "the Fair Sentencing Act." Obviously, such a construction would be nonsensical. Rather, the phrase "that was committed . . ." clearly modifies the most distant noun in the sentence, "violation." Thus, unlike *Rose*, this Court sees no reason to assume that, grammatically, the "indictment controls" theory is preferable.

To the contrary, careful parsing of Section 404(a) yields the conclusion that the "offense controls" theory is a far more reasonable reading of the statutory language. The modifier phrase in question here is "the statutory penalties for which," and the two nouns competing for the attention of that modifier are "violation" and "statute." Because "which" is a placeholder for the noun that is the object of the modifier, we can better understand the phrase by replacing "which" with each of the nouns. The notion of "statutory penalties for [a] violation" is perfectly logical; the notion of "statutory penalties for [a] statute" is not. Penalties are imposed <u>for</u> violations, they are not imposed <u>for</u> statutes. For the "indictment-controls" theory to find support in the text, Congress would have used the phrase ". . . a statute, the statutory penalties <u>of</u> which were modified. . . ." or "a statute, the penalties <u>in</u> which were modified." Here, Congress' choice of the preposition "for" is a clear indication that the "statutory penalties" phrase modifies the noun "violation," not "statute."

Construing "statutory penalties for which" to modify "violation" also eliminates the need for *Wirsing*'s most elaborate semantic gymnastics. Once again, the pertinent statutory language is "a violation of a [ ] statute, the statutory penalties for which were modified." *Wirsing* acknowledges that, "at first blush," the repetitive use of the word "statute" (or its cognate) "appears unnecessary." 943 F..3d at 186. It is indeed awkward to refer to "a statute [whose] statutory penalties [were] modified." *Wirsing* wriggles out of this dilemma by concluding that

8

the adjectival phrase "statutory penalties" is necessary "to avoid any ambiguity . . . between penalties specified by statute or by the Sentencing Guidelines." "In other words," it explains, "the word 'statutory' is required to clarify 'penalties' regardless of whether 'statutory penalties for which' modifies 'Federal criminal statute' or 'violation.'" *Id.* This is, quite simply, incorrect. Certainly, the duality of the statutory and Guidelines sentencing schemes has the potential to introduce ambiguity. But that duality – and the ensuing necessity of interposing an additional "statutory" to avoid any ambiguity – is present only where "statutory penalties" modifies "violation." A particular criminal violation results in two sentencing directives, a categorical one from the statute, and a fact-intensive one derived from the Guidelines. If the phrase "penalties for which" modifies "violation," it would be necessary for Congress to include the adjective "statutory" to guarantee that courts look for a change in statutory penalties, not changes to a guideline calculation for that offense. But the same logic does not apply if "penalties" modifies "statute." The penalties that a statute sets forth are <u>always</u> "statutory"; the Guidelines cannot modify statutes. "A statute, the statutory penalties for which . . ." is thus inherently redundant, and a construction to be avoided. "A violation[,] the statutory penalties for which," on the other hand, is a perfectly logical way to distinguish the statutory penalties for that violation from the Guideline's penalties for the same violation. For these and other reasons, this Court rejects the analysis of *Rose* and *Wirsing*, and finds that "statutory penalties" modifies the noun "violation," leading to the conclusion that the "offense controls" theory and not the "indictment controls" theory is the proper construction of Section 404(a).

B. <u>Congressional intent</u>

But acknowledging that both constructions have arguments in their favor (as *Rose* also admits, 379 F.Supp.3d at 229), that ambiguity requires the Court to consider Congressional

9

intent. In this regard, this Court disagrees with the analysis in *Rose* and *Wirsing* as to Congress' purpose in enacting the Fair Sentencing Act. The key to discerning Congressional intent is to examine the Controlled Substances Act as it existed both before and after the Fair Sentencing Act.

As noted above, the Controlled Substances Act created, for purposes of the present analysis, two tiers of drug offenses. Defendants who distribute moderate quantities of drugs – between 5 and 50 grams of crack under the pre-2010 version of the Act – are subject to moderately-severe penalties under 21 U.S.C. § 841(b)(1)(B). Defendants who are responsible for distributing large quantities of drugs – 50 grams or more of crack – are subject to the harshest penalties of 21 U.S.C. § 841(b)(1)(A). For purposes of illustration, imagine this sentencing scheme as a laboratory test involving rats, trapped in a cage with an electrified floor that delivers severe electrical shocks. The cage has a window, through which some rats can escape to a second cage whose floor, while still electrified, delivers less painful jolts. The window is narrow, so skinnier rats can fit through and escape to the less punitive cage, but fatter rats cannot. In the context of the Controlled Substances Act, that window was the drug quantity threshold that distinguishes the harshness of §841(b)(1)(A) from the less-harsh world of §841(b)(1)(B); the width of the window was no more than 50 grams of crack cocaine.

In essence, the Fair Sentencing Act was a response to criticisms that the Controlled Substances Act's crack cocaine window was far narrower than the window openings applicable to other drugs. Because the window for crack cocaine was so narrow, more defendants remained on the harsher side of the scheme, even if those defendants would have been able to pass through the otherwise-applicable open windows had they dealt in similar quantities of other drugs. To remedy this disparity, the Fair Sentencing Act opened the crack window wider: now more rats

10

could squeeze through the window into the safer cage, commensurate (more or less) with the quantities of rats that could squeeze through other drug windows. But the crack window was still finite and the largest rats – akin to defendants who distributed the highest quantities of crack – still could not fit through it; they still remained in the harsher cage. The Fair Sentencing Act did not change the level of electrical shocks delivered in either cage or otherwise modify the experiment in any other way; it simply made the window somewhat wider for crack defendants. Thus, a fair reading of Congress' intent in passing the Fair Sentencing Act was that it was only intended to benefit only those rats who were finally able to pass through the newer, wider window. Put differently, Congress' intent was to open up the milder sentences of §841(b)(1)(B) to a wider range of defendants responsible for dealing <u>moderate</u> amounts of drugs, while still leaving the harsh sentences of §841(b)(1)(A) in place to fully deter and punish persons who distributed the <u>largest</u> amounts of drugs.

If that is Congress' intent, the "conduct controls" reading of Section 404(a) of the Fair Sentencing Act is the one that best implements Congress' intent. By focusing on the specific violation conduct each defendant engaged in, courts can determine whether the Fair Sentencing Act modified the penalty the defendant faced – that is, whether the the Fair Sentencing Act's wider window allow this defendant to escape from the harshness of a § 841(b)(1)(A) punishment and into a §841(b)(1)(B) punishment. For defendants distributing moderate quantities of crack, the answer would be "yes" and resentencing them according to the reduced punishment tier would further Congressional intent. But for defendants who had distributed the highest quantities of drugs (*i.e.* more than 280 grams), the wider window changed nothing: they still could not fit through it and still remained subject to the harsh penalties of §841(b)(1)(A). There would be little purpose to resentencing them because nothing had changed – once again, the Fair

11

Sentencing Act did not change the levels of electrification in either cage or otherwise offer any solace to those who still could not fit through the wider window. Thus, a "conduct controls" interpretation of Section 404(a) effectuates Congressional intent.

Unfortunately, an "indictment controls" reading does not. With that reading, noting that the Fair Sentencing Act made adjustments to both §841(b)(1)(A) and (b)(1)(B), literally <u>every</u> defendant convicted of distributing crack prior to August 2010 is a defendant is eligible for relief because each was convicted pursuant to a "statute" modified by the Fair Sentencing Act. No distinction is made between defendants who moved small quantities of crack yet were caught up in the disproportionately-harsh sentencing scheme of the old version of §841(b), and high-level organizers of crack cartels and other drug kingpins, who were clearly never intended to benefit from the Fair Sentencing Act. Both are treated the same under an "indictment controls" scheme, even though the "resentencing" process for the latter is little more than a *pro forma* exercise that will yield precisely the same result as the initial sentencing. Thus, adopting an "indictment controls" reading of Section 404(a) requires District Courts to engage in thousands of unnecessary and futile resentencings. *Compare Blocker,* 378 F.Supp.3d at 1130 (pointing out that, at the time of debate over the Fair Sentencing Act, the Sentencing Commission estimated that only 2,600 crack defendants would be eligible for resentencing under a "conduct controls" theory) *with* U.S. Department of Justice, Bureau of Justice Statistics, *Drug Offenders in Federal Prison: Estimates of Characteristics Based on Linked Data*, https://www.bjs.gov/content/pub/pdf/dofp12.pdf (identifying some 26,000 crack defendants serving sentences as of 2012); *accord Rose*, 379 F.Supp.3d at 223 ("the Government's interpretation would dramatically curtail the reach of the First Step Act, limiting eligibility for relief to the narrow class of defendants who were found responsible for distributing more than 50

grams but less than 280 grams of crack cocaine"). This Court believes that such a reading is inconsistent with the clear Congressional purpose underlying the Fair Sentencing Act.

Moreover, an "indictment controls" scheme would create unreasonable disparities based on local charging practices of prosecutors. In many districts, the United States Attorney's practice has been simply to charge drug defendants with distribution of drugs at the statutory threshold for the appropriate punishment tier. In those jurisdictions – including this one –crack defendants prior to 2010 would have been charged with distributing "50 grams or more," regardless of whether the defendant actually distributed 51 grams or 51,000 grams. (Actual drug quantities would then be proven at trial.) Under an "indictment controls" interpretation, every such defendant would be entitled to a resentencing because the statutory penalties for distribution of 50 grams of crack changed with the Fair Sentencing Act.[4] But in other districts, prosecutors allege the specific amount of drugs involved in their indictments. *See e.g. U.S. v. Willis*, ___F.Supp.3d___, 2019 WL 4849435 (E.D. Pa. Sept. 30, 2019). Had Mr. Crooks been prosecuted in a district that followed that practice, his indictment would have charged him with distributing 500-2,000 grams of crack. As Mr. Crooks concedes, the Fair Sentencing Act made no changes to the statutory penalties applicable to defendants distributing more than 280 grams of crack, and he would not be entitled to resentencing under the First Step Act. Thus, under an "indictment controls" theory, defendants' eligibility for relief turns, to some degree, on the charging practices of local prosecutors, a factor that could hardly have been intended by Congress to be controlling. Under a "conduct controls" theory, however, each defendant's entitlement to relief is based entirely on the particular conduct committed by that defendant,

---

[4] Once again, Mr. Crooks' argument requires the Court to assume that the Indictment's "or more" language is meaningless.

13

ensuring no undue disparities resulting from facts, such as the litigation practices of the prosecuting jurisdiction, that lie beyond those defendants' control.

For these and other reasons, this Court disagrees with those courts adopting the "indictment controls" theory. Instead, this Court finds that the "offense controls" theory provides the correct interpretation of the First Step Act. Here, because Mr. Crooks' offense involved the distribution of more than 280 grams of crack cocaine, the Fair Sentencing Act's changes to 21 U.S.C. § 841(b)(1)(A) did not operate to modify the statutory penalties applicable to his particular violation. Thus, he is not eligible for resentencing under Section 404 of the First Step Act.

### 2. Application

Nevertheless, because this Court adopts a minority approach on an unsettled legal question, it is prudent to provide an alternative analysis that would apply if an appeals court determines that Mr. Crooks is indeed eligible for resentencing under the First Step Act.

The First Step Act "grants a district judge limited authority to consider reducing a sentence previously imposed." *U.S. v. Hegwood*, 934 F.3d 414, 418 (5th Cir. 2019). The only "explicit basis stated for a change in the sentencing" is that the "calculations . . . made under the Sentencing Guidelines are adjusted 'as if' the lower drug offense sentences were in effect at the time of the commission of the offense." *Id.* In other words, a resentencing under the First Step Act is not a plenary proceeding that allows reconsideration of collateral aspects of sentencing.

Here, applying the current Sentencing Guidelines to the statute of conviction and the quantities of drugs found by Judge Sparr yields the following analysis. Guideline §2D1.1(a)(5) applies, referring the Court to the Drug Quantity Table. Judge Sparr's finding that Mr. Crooks was jointly responsible for between 1,700 and 2,100 grams of crack distributed by the conspiracy

places him at level 4 on that table (840 g to 2.8 kg of crack), yielding a base Offense Level of 32 (previously 38). The Presentence Report for Mr. Crooks did not disclose any Specific Offense Characteristics or other adjustments to his Offense Level, and thus, his total Offense Level is 32. Mr. Crooks' Criminal History category remains at VI. That combination yields a Guideline range of 210 to 262 months.

But Judge Sparr also found that Mr. Crooks was a Career Offender under §4B1.1 of the Guidelines, and the resentencing under the First Step Act is not an invitation to revisit the correctness of that determination under current law. *Hegwood*, 934 F.3d at 417-18. Thus, the Court applies the Career Offender guideline of §4B1.1(b). That guideline provides that if the Offense Level of the underlying crime is lower than the Offense Level set forth in a table, the Court should apply the higher Offense Level found in §4B1.1. The table considers the statutory maximum punishment for the underlying crime. The Fair Sentencing Act adjusted the drug thresholds of 21 U.S.C. § 841(b)(1)(A) but did not alter their statutory maximums. The maximum penalty for a violation of 21 U.S.C. § 841(b)(1)(A) remains life imprisonment. Thus, under §4B1.1(b)(1), Mr. Crooks' Offense Level rises to 37. At an Offense Level of 37 and a Criminal History category of VI, Mr. Crooks' guideline range is 360 months to life. This is exactly the same range that Judge Sparr considered, and thus, even if Mr. Crooks were entitled to resentencing under the First Step Act, the Court would, in its discretion, find that no adjustment in his sentence is warranted.

Mr. Crooks argues that this construction of the Career Offender guideline is incorrect. Mr. Crooks contends that, because he was charged with distributing 50 grams or more of crack (and not 280 grams or more), the lower tier penalties at 21 U.S.C. § 841(b)(1)(B) supply the statutory maximums to be considered when applying §4B1.1. Under §841(b)(1)(B), the statutory

maximum penalty is 40 years, rather than life. Under §4B1.1(b)(2), then, the Offense Level would instead be 34, and Mr. Crooks' guideline range would be 262-327 months. The Court rejects this argument. Mr. Crooks was charged in the Indictment with violating 21 U.S.C. § 841(b)(1)(A), not §841(b)(1)(B), and the proof at trial demonstrated that he distributed quantities of crack cocaine sufficient to satisfy §841(b)(1)(A), even after that threshold was adjusted by the Fair Sentencing Act. The fact that the Indictment charged him with distributing "50 grams or more" and that intervening law has made distribution of 50 to 279 grams a less-severe offense is irrelevant. The "or more" clause of the Indictment gave Mr. Crooks notice that the Government believed he may have distributed more than 50 grams, and the proof at trial confirmed that he had.[5] Thus, there is no basis to treat Mr. Crooks' Career Offender status as being controlled by 21 U.S.C. § 841(b)(1)(B), rather than §841(b)(1)(A).

Accordingly, the Court denies Mr. Crooks' motion seeking resentencing under the First Step Act.

**B. Section 3582**

Separately, Mr. Crooks contends that he is eligible for resentencing by operation of 18 U.S.C. § 3582(c)(2). That statute provides that where a defendant has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the

---

[5] In this sense, Mr. Crooks' reliance on *U.S. v. Tucker*, 356 F.Supp.3d 808, 809 (S.D. Ia. 2019), is misplaced. There, the defendant pled guilty to distributing only 50 grams of crack cocaine. In such circumstances, the trial court correctly concluded that, after application of the Fair Sentencing Act, the Career Offender guideline was governed by 21 U.S.C. § 841(b)(1)(B), rather than (b)(1)(A), and that the defendant's correct Offense Level was 34. Had the proof at trial established that Mr. Crooks was responsible for only 50 grams of crack, he would be correct in relying on *Taylor*. But the evidence at trial proved that Mr. Crooks was responsible for as much as 40 times that amount, placing him comfortably within §841(b)(1)(A) and its statutory maximum of life imprisonment.

16

Sentencing Commission, the defendant may petition the court to reduce his sentence in accordance with applicable policy statements issued by the Commission.

Mr. Crooks' argument on this point is identical to the issue discussed immediately above: Mr. Crooks' contention that the Fair Sentence Act's interplay with the Career Offender guideline of §4B1.1 renders his Offense Level to be 34, rather than 37 (or 38). For the reasons discussed above, the Court rejects this argument and finds that Mr. Crooks' correct Offense Level is 37. Because the current guideline range applicable to Mr. Crooks – 360 months to life – is identical to the range that Judge Sparr considered, Mr. Crooks has not shown that he is entitled to relief under 18 U.S.C. § 3582(c)(2).

## CONCLUSION

For the foregoing reasons, Mr. Crooks' Motion to Reduce Sentence **(# 1988)** is **DENIED**. Mr. Crooks' Motion to Expedite **(# 1997)** is **DENIED AS MOOT**.

Dated this 17th day of January, 2020.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge